548 S.E.2d 887

**SOUTH CAROLINA COASTAL CONSERVATION LEAGUE and Sierra Club, Appellants,**

v.

**SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Office of Ocean and Coastal Resource Management; Port Royal Plantation; and Town of Hilton Head Island, Respondents.**

No. 3358.

Court of Appeals of South Carolina.

Heard April 5, 2001.

Decided June 18, 2001.

526

James S. Chandler, Jr., of South Carolina Environmental Law Project, of Pawleys Island, for appellants.

Curtis L. Coltrane, of Coltrane & Alford, of Hilton Head Island and Mary D. Shahid, of DHEC Office of Ocean & Coastal Resource Management, of Charleston, for respondents.

Amicus Curiae: C.C. Harness, III, and Grahame E. Holmes, both of Mt. Pleasant, for DeBordieu Colony Community Association, Inc.

SHULER, Judge:

The circuit court affirmed a summary judgment order of the Administrative Law Judge Division (ALJD), upholding a permit issued by the Department of Health and Environmental Control (DHEC) allowing Port Royal Plantation to refurbish a groin field and construct new groins along the beach on Hilton Head Island. South Carolina Coastal Conservation League (SCCCL) and Sierra Club appeal, arguing the South Carolina Beachfront Management Act prohibits such construction. We reverse.

## FACTS/PROCEDURAL HISTORY

In April 1996 Port Royal Plantation applied to the Office of Ocean and Coastal Resource Management (OCRM), a division of DHEC, for a permit to construct four new groins and refurbish a series of seventeen existing groins (a "groin field") along approximately 8,000 feet of shoreline at Hilton Head.[1] OCRM issued the permit on October 2, 1996.

SCCCL and Sierra Club filed a petition for administrative review of the permit decision and requested a contested case hearing before the ALJD. The petition named Port Royal Plantation and OCRM as respondents, and the administrative law judge (ALJ) granted the Town of Hilton Head's motion to

---

1. A groin is a structure built on the beach, often of large rocks or timber, running perpendicular to the shore and extending into the ocean. It is designed to retard erosion by trapping littoral drift, i.e., the shifting sand along the shore that results from wave action. See 23A S.C.Code Ann. Regs. 30–1(D)(23) (Supp.2000). A "groin field" is a series of two or more groins in close proximity which exert overlapping areas of influence. Id.

intervene. Thereafter, the parties filed cross-motions for summary judgment. Prior to the hearing, the parties stipulated to the relevant facts and agreed that the only issue remaining was a question of law for the court: Whether the Beachfront Management Act prohibited the proposed construction.

By order dated June 16, 1998, the ALJ found the permit to refurbish the groin field and construct new groins valid. SCCCL and Sierra Club appealed this decision to the OCRM's Coastal Zone Management Appellate Panel, which adopted the order of the ALJ and affirmed on December 17. SCCCL and Sierra Club subsequently sought judicial review in the circuit court, which likewise affirmed DHEC's grant of the permit in an order filed February 7, 2000. This appeal followed.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP; see also Tupper v. Dorchester County, 326 S.C. 318, 325, 487 S.E.2d 187, 191 (1997). On appeal, a reviewing court may reverse the decision of an administrative agency if a party's substantial rights are prejudiced by a decision which "violate[s] constitutional or statutory provisions...." Weaver v. S.C. Coastal Council, 309 S.C. 368, 374, 423 S.E.2d 340, 343 (1992); see also S.C.Code Ann. § 1–23–380(6) (Supp.2000).

## LAW/ANALYSIS

The sole issue in this appeal is whether the groin construction and refurbishment permit issued by DHEC to Port Royal Plantation violates the statutory provisions of the Beachfront Management Act. We believe it does.

In 1977 our Legislature passed the Coastal Zone Management Act (CZMA) to "protect, preserve, restore and enhance the coastal resources of South Carolina." 23A S.C.Code Ann. Regs. 30–1(C)(1) (Supp.2000); see Beard v. S.C. Coastal Council, 304 S.C. 205, 207, 403 S.E.2d 620, 621 (1991) ("Like the 1988 Beachfront Management Act, the purpose of the 1977 Act was to protect, restore and enhance the coastal environ-

ment."). To accomplish this goal, the CZMA created a state agency, the South Carolina Coastal Council, to administer and enforce its provisions.[2] *Id.* The Council's regulatory authority, however, was inadequate to forestall extensive private beachfront development along the coast and, as a result, erosion became a serious threat. *See* S.C.Code Ann. § 48–39–250(4) (Supp.2000); 23A S.C.Code Ann. Regs. at 30–1(C)(1) & (2).

Realizing the gravity of the problem, the Legislature enacted the Beachfront Management Act in 1988.[3] Promulgated to further the coastal protection afforded under the CZMA, the Act was a direct response to a report by the Blue Ribbon Committee on Beachfront Management that determined South Carolina's beach/dune system was in crisis.[4] *See* 23A S.C.Code Ann. Regs. at 30–1(C)(3). Specifically, the report noted that "over fifty-seven miles of our beaches [were] critically eroding," thereby threatening "life, property, the tourist industry, vital State and local revenue, marine habitat, and a national treasure[.]" *Id.*

To combat the erosional threat, the Beachfront Management Act devised a statutory scheme to restore the beach/dune system by promoting gradual retreat from the beachfront over a forty-year period. *See* § 48–39–280; 23A S.C.Code Ann. Regs. at 30–1(C)(6). To this end, the legislation directed DHEC to "develop and institute a comprehensive beach erosion control policy," and prohibited the use of any "critical area," including the beach, without first obtaining a permit from DHEC. § 48–39–120(A) & 130(A).[5]

---

2. A 1993 amendment to the CZMA merged the South Carolina Coastal Council with DHEC, creating the OCRM and Coastal Zone Management Appellate Panel. *See* § 48–39–40; 23A S.C.Code Ann. Regs. at 30–1(A)(1).

3. In 1990 the Legislature amended the Act in response to litigation and the aftermath of Hurricane Hugo. *See generally* Newman Jackson Smith, *Analysis of the Regulation of Beachfront Development in South Carolina*, 42 S.C. L.Rev. 717 (1991).

4. The beach/dune system is defined as "all land from the mean highwater mark of the Atlantic Ocean landward to the 40 year setback line described in § 48–39–280." 23A S.C.Code Ann. Regs. at 30–1(D)(5).

5. "Critical areas" are defined as any of the following: (1) coastal waters, (2) tidelands, (3) beach/dune systems, and (4) beaches. 23A S.C.Code Ann. Regs. at 30–1(D)(13).

In general, three methods are used to manage the problem of shoreline erosion: armoring the beach with "hard" erosion control devices; renourishing the beach with sand; and retreating from the beach altogether.[6] 23A S.C.Code Ann. Regs. at 30–1(C)(5). Enactment of the Beachfront Management Act evidences a clear legislative choice favoring the latter two policies. *See, e.g.,* § 48–39–290(B)(2) (governing all construction, reconstruction and alterations between the baseline[7] and the setback line,[8] thereby prohibiting the construction of new erosion control devices seaward of the setback line except for the protection of a pre-existing public highway and strictly regulating the repair or replacement of such devices if destroyed); § 48–39–250(5) ("The use of armoring in the form of hard erosion control devices such as seawalls, bulkheads, and rip-rap to protect erosion-threatened structures adjacent to the beach has not proved effective.... In reality, these hard structures, in many instances, have increased the vulnerability of beachfront property to damage from wind and waves while contributing to the deterioration and loss of the dry sand beach which is so important to the tourism industry."); § 48–39–260(3) (stating that the policy of South Carolina is to "severely restrict the use of hard erosion control devices to armor the beach/dune system and to encourage the replacement of hard erosion control devices with soft technologies as approved by [DHEC] which will provide for the protection of the shoreline without long-term adverse effects").[9]

---

6. "Beach nourishment" is defined as "the artificial establishment and periodic renourishment of a beach with sand that is compatible with the existing beach in a way so as to create a dry sand beach at all stages of the tide." § 48–39–270(4); *see also* 23A S.C.Code Ann. Regs. at 30–1(D)(19)(d).

7. The baseline of a standard [non-inlet] erosion zone generally is fixed at the crest of the primary oceanfront sand dune. Where alterations have occurred, either natural or man-made, DHEC must establish the baseline using the best scientific and historical data available indicating where the crest would have been located had the shoreline not been altered. *See* § 48–39–280(A)(1).

8. The setback line is established by DHEC landward of the baseline at a distance forty times the average annual erosion rate or not less than twenty feet. *See* § 48–39–280(B).

9. DHEC regulations explicitly embrace this patent expression of legislative intent. *See* 23A S.C.Code Ann. Regs. at 30–1(C)(2) ("[H]ard ero-

■ Reflecting this preference, the Beachfront Management Act expressly states that "[n]o new construction or reconstruction is allowed seaward of the baseline," as determined by DHEC, except the following:

(1) wooden walkways no larger in width than six feet

(2) small wooden decks no larger than one hundred forty-four square feet

(3) fishing piers which are open to the public . . .

(4) golf courses

(5) normal landscaping

(6) structures specifically permitted by special permit as provided in subsection (D)

(7) pools may be reconstructed if they are landward of an existing, functional erosion control structure or device. . . .

§ 48–39–290(A).[10] We agree with SCCCL and Sierra Club that this section precludes OCRM from issuing *any* permits

___

sion control devices can result in increased erosion, a lowering of the beach profile . . . and a decrease in the ability of the beach/dune system to protect upland property from storms and high tides. Often the result of attempting to protect upland property with hard erosion control structures is that dry sand beaches disappear, thereby placing many millions of tourist dollars in jeopardy and destroying this natural legacy for future generations."); 23A S.C.Code Ann. Regs. at 30–1(C)(4) ("It has been clearly demonstrated that the erosion problems of this State are caused by a persistent rise in sea level, a lack of comprehensive beach management planning, and poorly planned oceanfront development, including construction of hard erosion control structures, which encroach upon the beach/dune system."); 23A S.C.Code Ann. Regs. at 30–1(C)(6) (The CZMA, as amended, "rejects construction of new erosion control devices and adopts retreat and renourishment as the basic state policy towards preserving and restoring the beaches of our state."); 23A S.C.Code Ann. Regs. at 30–11(D)(2) ("[DHEC] shall promote soft-solutions to erosion within the context of a policy of retreat of development from the shore and prevent the strengthening and enlargement of existing erosion control structures.").

**10.** Subsection (D) authorizes DHEC to issue "special permits" to build or rebuild structures other than erosion control structures or devices *only if* such structures are not located on the "active beach." § 48–39–290(D). The active beach is defined as "that area seaward of the escarpment or the first line of stable natural vegetation, whichever first occurs, measured from the ocean." § 48–39–270(13). Groins, there-

for the construction or refurbishment of groins, which clearly are constructed seaward of the baseline and do not fit within a statutory exception.[11]

Although Respondents acknowledge, as did the circuit court and ALJD, that this conclusion stems from a "literal reading" of section 48–39–290(A),[12] they argue the section should not be interpreted in isolation from other provisions of the Beachfront Management Act.[13] We agree. *See, e.g., Williams v. Williams*, 335 S.C. 386, 389–90, 517 S.E.2d 689, 690–91 (1999) ("[T]his Court's primary function is to ascertain the intention of the legislature. . . . The Court should consider not merely the language . . . being construed, but the word[s] and [their] meaning in conjunction with the purpose of the whole statute and the policy of the law."); *Gardner v. Biggart*, 308 S.C. 331, 333, 417 S.E.2d 858, 859 (1992) ("A statutory provision should be given a reasonable and practical construction consistent with the purpose and policy expressed in the statute.") (quot-

fore, by definition constructed on the active beach, are excluded from this statutory exception.

**11.** It cannot seriously be debated that the development or refurbishing of groins constitutes "construction" or "reconstruction" as contemplated by section 48–39–290(A). *See* Attachment A to Port Royal Plantation's Permit Application ("Work will consist of the addition of armor rock and bedding stone so as to reconstruct more meaningful structure elevations and cross-sections."); Joint Pub. Notice of the U.S. Army Corps of Eng'rs, Charleston Dist. and the S.C. Dep't of Health & Envtl. Control Office of Ocean & Coastal Res. Mgmt. (existing groin materials include "palm tree trunks, concrete rubble and granite stones"); DHEC Critical Area Permit (special condition allows "only rock material" to be used for "groin construction").

**12.** Indeed, Respondents admit the plain language of the statute bars the construction of groins:

> If § 48–39–290(A) and (D) are interpreted literally, without reference to other portions of the Act, then it would appear that the construction or reconstruction of groins is prohibited. Groins are not mentioned in the enumerated exceptions found in § 48–39–290(A) and groins, by their nature, are constructed partially on the active beach and in intertidal areas, in contradiction to § 48–39–290(D).

Final Brief of Respondents at 11–12.

**13.** We note here that because the brief of Amicus Curiae DeBordieu Colony Community Association sets forth essentially the same arguments as that of DHEC, Port Royal Plantation, and the Town of Hilton Head, we include DeBordieu in our use of the term "Respondents."

ing *Hay v. S.C. Tax Comm'n,* 273 S.C. 269, 273, 255 S.E.2d 837, 840 (1979)); *Burns v. State Farm Mut. Auto. Ins. Co.,* 297 S.C. 520, 522, 377 S.E.2d 569, 570 (1989) ("In ascertaining [legislative] intent, statutes which are part of the same Act must be read together."). However, even construing the Act as a whole, Respondents' arguments are unavailing.

■ Initially, we believe Respondents are correct in asserting that groins, as defined herein, are not "erosion control structures or devices" as defined in the Act. On its face, the statutory definition of "erosion control structures or devices" does not reference groins and enumerates only three types: seawalls, bulkheads, and revetments. *See* § 48–39–270(1). However, because the word "include" may be seen as one of limitation or enlargement, we must turn to rules of construction to ascertain the Legislature's true intent. *See Baker v. Chavis,* 306 S.C. 203, 208–09, 410 S.E.2d 600, 603 (Ct.App. 1991) (citing *N.C. Turnpike Auth. v. Pine Island, Inc.,* 265 N.C. 109, 143 S.E.2d 319 (1965) ("includes" is *ordinarily* a word of enlargement and not of limitation) (emphasis added); *Frame v. Nehls,* 452 Mich. 171, 550 N.W.2d 739, 742 (1996) (stating that "[w]hen used in the text of a statute, the word 'includes' can be used as a term of enlargement or of limitation, and the word in and of itself is not determinative of how it is intended to be used," the court, upon reviewing the entire act containing the statute at issue along with its legislative history, construed "includes" followed by two descriptive provisions to be a term of limitation despite other, more expansive uses of the defined term throughout the act); *Black's Law Dictionary* 763 (6th ed.1990) (depending on context "include" may express enlargement or limitation).

In our view, the statutory collocation suggests an intent to circumscribe the definitional meaning of "include" by stating:

(1) Erosion control structures or devices include:

(a) seawall: a special type of retaining wall that is designed specifically to withstand normal wave forces;

(b) bulkhead: a retaining wall designed to retain fill material but not to withstand wave forces on an exposed shoreline;

(c) revetment: a sloping structure built along an escarpment or in front of a bulkhead to protect the shoreline or bulk-head from erosion.

§ 48–39–270(1). In other words, the legislative decision to set forth each erosion control structure mentioned in a separate, individually-defined format reinforces the inference that lawmakers intended "include" to limit the definition. The statute, therefore, is interpreted best through application of the rule of construction known as "expressio unius est exclusio alterius," meaning "to express or include one thing implies the exclusion of another, or of the alternative." *Hodges v. Rainey*, 341 S.C. 79, 86, 533 S.E.2d 578, 582 (2000) (quoting *Black's Law Dictionary* 602 (7th ed.1999)). Applying this rule, we may presume the Legislature meant to exclude other structures also designed to deter erosion when they only listed seawalls, bulkheads, and revetments in the statute.

This conclusion is supported by the fact that the three structures designated in the statute, namely seawalls, bulkheads, and revetments, parallel the shoreline and function as a barrier to "armor" it against the elements and retain sand in an effort to inhibit erosion, while groins are constructed perpendicular to the shore and operate to impede erosion by controlling the natural movement of sand that results from waves hitting the beach at an angle. *See generally* § 48–39–250(5) ("[A]rmoring in the form of hard erosion control devices such as seawalls, bulkheads, and rip-rap to protect erosion-threatened structures adjacent to the beach has not proved effective. These armoring devices have given a false sense of security to beachfront property owners."); § 48–39–260(3) (policy of the state is to "severely restrict the use of hard erosion control devices to armor the beach/dune system"); 23A S.C.Code Ann. Regs. at 30–1(D)(23) ("Groins are usually perpendicular to the shore and extend from the shoreline into the water far enough to accomplish their purpose.").

Moreover, restricting the statutory meaning of erosion control structures to seawalls, bulkheads, and revetments corresponds to related provisions in the Act. *See* § 48–39–280(A)(1) ("In standard erosion zones in which the shoreline has been altered naturally or artificially *by the construction of erosion control devices, groins, or other manmade alterations ....*") (emphasis added); § 48–39–290(B)(2) (section governing the

construction and reconstruction of erosion control devices and which by definition applies only to structures situated between the baseline and the setback line, thereby excluding anything built on the active beach); § 48–39–290(B)(2)(b)(iv) (subsection strictly regulating the repair or replacement of "erosion control structures or devices" and setting forth specific assessment and measuring instructions solely for seawalls, bulkheads, and revetments); § 48–39–250(5) (stating that "[t]he use of armoring in the form of hard erosion control devices such as *seawalls, bulkheads and rip-rap* to protect erosion-threatened structures adjacent to the beach has not proven effective.") (emphasis added).[14]

Having determined groins are not "erosion control structures or devices" as contemplated by the Beachfront Management Act, it is readily apparent that some statutory sections are not relevant to our analysis. For example, section 48–39–

---

14. We realize section 48–39–250(5)'s reference to "erosion control structures such as seawalls, bulkheads, *and rip-rap* " could be interpreted to expand the definition of erosion control structures beyond those enumerated in section 48–39–270(1) (emphasis added). The Beachfront Management Act does not define the term "rip-rap." However, although "rip rap" may be defined solely as "large rocks" or chunks of stone, *see Seyler v. Burlington Northern Santa Fe Corp.*, 102 F.Supp.2d 1226 (D.Kan.2000), it usually refers to a retaining wall made of rip rap material or, alternatively, the use of rip rap material to reinforce such a wall. *See, e.g., Muir v. Coastal Res. Mgmt. Council,* 2001 WL 345817 at n. 1 (R.I.Super. March 21, 2001) ("A revetment is a structure built to armor a sloping shoreline face usually composed of one or more layers o[f] stone or concrete riprap.... A riprap consists of stone or concrete blocks that are dumped or placed and installed without mortar."); *Steptoe v. True,* 38 S.W.3d 213, 215 (Tex.App.2001) (discussing a bulkhead made out of "rip-rap"); *Oliver v. Amity Mut. Irrigation Co.,* 994 P.2d 495, 498 (Colo.Ct.App.1999) (defining riprap as "a foundation or sustaining wall of stones"); *Payne v. City of Galveston,* 772 S.W.2d 473, 475 (Tex.App.1989) ("On the beach at the base of the seawall are piles of granite and limestone boulders, called 'rip-rap,' which stabilize the sand at the base of the wall from erosion."); *State v. Putman,* 552 A.2d 1247, 1248 (Del.Super.Ct.1988) (defining revetment as "rip-rapping"); *Barrie v. Cal. Coastal Comm'n,* 196 Cal.App.3d 8, 241 Cal.Rptr. 477, 485 (1987) (discussing "riprap" located at the base of a seawall); *Webster's New World College Dictionary* 1237 (4th ed.1999) (citing primary definition of rip rap as "a foundation or wall made of large chunks of stone thrown together irregularly or loosely"). The use of "rip-rap" in section 48–39–250(5), therefore, is consistent with the limited definition of erosion control structures or devices contained in section 48–39–270(1).

290(B)(2), governing construction, reconstruction and alteration of erosion control devices, does not apply. Section 48–39–120(B), authorizing DHEC to issue permits for erosion control structures, similarly is inapplicable. On the other hand, subsection 48–39–290(A)(6)(D) does apply, because it concerns permits "to build or rebuild a structure other than an erosion control structure or device." However, because it bans all construction on the "active beach," the subsection still operates to preclude the development or refurbishment of groins. *See* § 48–39–290(A)(6)(D).[15]

■ Although Respondents do not rely on section 48–39–120(F) in their brief, both the circuit court and ALJD construed this section as authorizing DHEC to issue permits for the construction and reconstruction of new or existing groins. The section provides:

[DHEC], for and on behalf of the State, may issue permits not otherwise provided by state law, for erosion and water drainage structure in or upon the tidelands, submerged lands and waters of the State below the mean high-water mark as it may deem most advantageous to the State for the purpose of promoting the public health, safety and welfare, the protection of public and private property from beach and shore destruction and the continued use of tidelands, submerged lands and waters for public purposes.

§ 48–39–120(F). The statute does not define "erosion and water drainage structure." Even assuming, arguendo, that the term "erosion and water drainage structure" could be interpreted to encompass groins, subsection (F) may not be employed to validate construction expressly prohibited by the clear language of section 48–39–290(A).

---

**15.** Respondents are correct in asserting the Legislature purposely enacted the special permit provision contained in exception (6) of section 48–39–290(A) to prevent unconstitutional takings of the type ultimately struck down in *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Section 48–39–290 was enacted as part of the 1990 amendments to the Beachfront Management Act, originally enacted in 1988. According to Respondents, therefore, the plain language of the section should not control because it "is inconsistent with the historical basis for the 1990 amendments." To the contrary, we believe section 48–39–290's blanket prohibition on any construction on the active beach fully accords with *Lucas,* as the active beach, by definition, is not subject to claims of private ownership.

In finding the permit issued by DHEC in this case valid, the ALJD erroneously interpreted the phrase "not otherwise provided by state law." While no South Carolina case has construed this precise language, *State v. Jenkins*, 26 S.C. 121, 1 S.E. 437 (1887), is instructive.

In *Jenkins*, our supreme court held Article 4 § 18 of the state constitution, granting courts of general sessions exclusive jurisdiction in all criminal cases "which shall not be otherwise provided by law," governed jurisdiction in cases of petit larceny because no other provision of law limited punishment for the crime such that jurisdiction could be had by trial justices as specified in Article 1 § 19.[16] *Jenkins*, 26 S.C. at 123, 1 S.E. at 438. In so doing, the court further noted:

> If the general assembly had since [the enactment of the constitution] limited the punishment of. petit larceny as mentioned in art. I., section 19, this, under the language of the section, would have conferred exclusive jurisdiction upon trial justices, and consequently would have ousted the jurisdiction of the General Sessions, as by such [legislative] act jurisdiction in such cases would have been "otherwise provided by law."

*Id.* at 123–24, 1 S.E. at 439.

Because we view subsection (F)'s reference to permits "not otherwise provided by state law" as synonymous with the phrase "shall not be otherwise provided by law" interpreted in *Jenkins*, we find the Legislature intended to restrict DHEC's authority to issue permits for erosion and water drainage structures to those circumstances in which no other provision of state law applies.[17] *See id.; City of New York v. Dist. Council 37, Am. Fed'n of State, County & Mun. Employees, AFL–CIO*, 181 Misc.2d 131, 692 N.Y.S.2d 593, 598 (1999) (language in city charter stating mayoral power exists only to

---

**16.** This constitutional provision vested jurisdiction in trial justices, i.e., justices of the peace or "other officers authorized by law," for all non-felony offenses where the punishment did not exceed a $100 fine or thirty days imprisonment. *See* S.C. Const. 1868 art. I, § 19.

**17.** "Not otherwise provided by law" has been held analogous to "unless otherwise provided by law," *Arends v. Iowa Select Farms, L.P.*, 556 N.W.2d 812, 815 (Iowa 1996), and "except as otherwise provided by law," *Matthews v. Purcell Seed & Grain Co.*, 867 P.2d 1359, 1360 (Okla.Ct.App.1993).

the extent "not otherwise provided by law" implies that the mayor's powers "are subject to the constraints, if any, contained in the Taylor Law and other state laws"). Accordingly, since section 48–39–290(A) clearly pertains to *all* beachfront construction and reconstruction seaward of the baseline, section 48–39–120(F) cannot serve to ratify the groin permit issued to Port Royal Plantation.[18]

■ The circuit court's analysis of subsection (F) is similarly misplaced. In finding the groin permit valid, the circuit court relied in part on DHEC's interpretation of the provision, which would "allow the construction or reconstruction of groins in conjunction with beach nourishment." While we agree with the circuit court that the construction given a statute by the agency charged with its administration is entitled to the utmost consideration on appeal such that it will not be overruled absent compelling reasons, *see Captain's Quarters Motor Inn, Inc. v. S.C. Coastal Council*, 306 S.C. 488, 413 S.E.2d 13 (1991), an agency's construction "affords no basis for the perpetuation of a patently erroneous application of [a] statute." *Monroe v. Livingston*, 251 S.C. 214, 217, 161 S.E.2d 243, 244 (1968). Thus, because DHEC's interpretation of section 48–39–120(F) conflicts directly with the express language of section 48–39–290(A), it cannot serve as a basis for upholding Port Royal's permit. *See Hodges*, 341 S.C. at 88, 533 S.E.2d at 582 ("[T]his Court should not completely disregard the text of an unambiguous statute based on an alleged conflict with an earlier statute.").

---

18. Of course, had the Legislature desired to override the express prohibition of section 48–39–290(A), it could have amended subsection (F) and authorized DHEC to issue permits, *notwithstanding any other provision of state law*, for erosion and water drainage structures, *see Mosteller v. County of Lexington*, 336 S.C. 360, 364, 520 S.E.2d 620, 622 (1999) (finding the Legislature's use of the phrase "[n]otwithstanding any other provision of law" in a statute indicates a clear intention to exclude other provisions of law so that the section employing such language trumps the requirements of other applicable sections), or, alternatively, included an exception in section 48–39–290 for groins and similar structures. *See Berkebile v. Outen*, 311 S.C. 50, 53, 426 S.E.2d 760, 762 (1993) ("A basic presumption exists that the legislature has knowledge of previous legislation when later statutes are passed on a related subject.").

The circuit court further noted that DHEC has promulgated regulations specifically governing groins. *See, e.g.,* 23A S.C.Code Ann. Regs. at 30–13(N) (setting forth standards for the "special permits" required of "[g]roins, jetties and offshore breakwaters," because such structures "interfere with the natural transport of sediment").[19] It is well settled, however, that "[a]lthough a regulation has the force of law, it may not alter or add to a statute." *Goodman v. City of Columbia,* 318 S.C. 488, 490, 458 S.E.2d 531, 532 (1995); *Soc'y of Prof'l Journalists v. Sexton,* 283 S.C. 563, 567, 324 S.E.2d 313, 315 (1984) (finding DHEC regulation that contravened statutory provisions invalid because a regulation "must fall when it alters or adds to a statute"); *compare U.S. Outdoor Adver., Inc. v. S.C. Dep't of Transp.,* 324 S.C. 1, 481 S.E.2d 112 (1997) (upholding definition of statutory term provided by agency regulation where the statute specifically authorized DOT to enact regulations more limiting than the terms of the statute); *Glover v. Suitt Constr. Co.,* 318 S.C. 465, 458 S.E.2d 535 (1995) (employing agency regulation to aid statutory interpretation where both the regulation and statute evinced the *same* legislative intent).

Respondents urge this Court to uphold Port Royal's permit because groins purportedly extend the life of beach renourishment projects, a declared goal of the Beachfront Management Act.[20] *See* § 48–39–260(5) (stating policy of South Carolina is

---

**19.** Interestingly, DHEC regulation 30–13(N) directly conflicts with other, more specific agency regulations. *See* 23A S.C.Code Ann. Regs. at 30–11(D)(4) ("No permit shall be issued which is inconsistent with the state [coastal management] plan...."); 23A S.C.Code Ann. Regs. at 30–11(D)(5) ("[DHEC] shall be guided by the prohibitions against construction contained in Section 48–39–290 and Section 48–39–300....").

**20.** Respondents also claim that read literally, section 48–39–290(A) would proscribe renourishment altogether, because the process of artificially nourishing the beach with sand is a "construction" project that utilizes heavy equipment like trucks and backhoes. This argument is meritless. *See Black's Law Dictionary* 308, 1278 (7th ed.1999) (defining "construction" as "[t]he act of *building*" or "the thing so *built*"; also defining "reconstruction" as "[t]he act or process of *rebuilding*") (emphasis added); *Webster's New World College Dictionary* 192 (4th ed.1999) (defining parallel meaning of "build" as "to make by putting together materials, parts, etc."). Obviously, since the placing of sand on the open beach can in no way be described as "building" or

to "promote carefully planned nourishment as a means of beach preservation and restoration where economically feasible"). In particular, Respondents claim an absolute ban on all groin construction and reconstruction would lead to "a result so absurd that it could not have been intended" by the Legislature, because groins are essential to the preservation of newly deposited beach sand. We need not decide whether groins in fact enhance such projects, a determination inappropriate for summary judgment, because, in the absence of ambiguity or contrary statutory provisions, the plain language of section 48–39–290 must control. *See Hodges*, 341 S.C. at 85, 533 S.E.2d at 581 ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will.") (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03 at 94 (5th ed.1992)); *City of Columbia v. ACLU of S.C., Inc.*, 323 S.C. 384, 387, 475 S.E.2d 747, 749 (1996) ("Where the terms of the statute are clear, the court must apply those terms according to their literal meaning.").

■ Finally, Respondents argue the Court is required to read the 1999 South Carolina Beach Restoration and Improvement Trust Act, S.C.Code Ann. §§ 48–40–10 to—70 (Supp. 2000), in conjunction with the Beachfront Management Act to glean the Legislature's true intent regarding the construction or reconstruction of groins. We disagree.

In making this argument, Respondents rely on language found in section 48–40–20, specifically a definition of renourishment which reads in part:

"Beach renourishment" means the artificial establishment and periodic renourishment of a beach with sand ... as described in Section 48–39–270, *to include where considered appropriate and necessary by [OCRM], groin construction and maintenance to extend the life of such projects.*

§ 48–40–20(3) (emphasis added). Although we agree this provision is indicative of some purposeful consideration of groins, this Court may not disregard the otherwise clear intent of the Legislature.

---

"rebuilding," section 48–39–290(A) has no effect on clearly permitted nourishment projects.

The General Assembly enacted the Beach Restoration and Improvement Trust Act for the express purpose of establishing a "trust" to provide matching funds to qualifying local governments for beach restoration projects. *See* § 48–40–30(1). In so doing, the Legislature chose not to amend the Beachfront Management Act, but rather to create the fund in a separate chapter of Title 48. Indeed, the definition of beach renourishment therein is prefaced by the unambiguous phrase *"[a]s used in this chapter."* § 48–40–20 (emphasis added). In our view, these decisions evince a legislative intent to leave the mandatory provisions of the Beachfront Management Act intact.

Moreover, under our general rules of statutory construction, the Beach Restoration and Improvement Trust Act, a general statute, cannot supersede the more specific Beachfront Management Act. *See Wooten ex rel. Wooten v. S.C. Dep't of Transp.*, 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999) ("A specific statutory provision prevails over a more general one."); *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors Div. of Unidynamics Corp.*, 319 S.C. 556, 558, 462 S.E.2d 858, 859 (1995) ("The general rule of statutory construction is that a specific statute prevails over a more general one.").

In the final analysis, we believe our construction of section 48–39–290 fully comports with the purpose and policy of the Beachfront Management Act. *See, e.g., S.C. Coastal Mgmt. Program Document* IV–53 to IV–54 (1977, 1979) (pursuant to section 48–39–90(D), the "final management plan for the State's coastal zone," states that the "trapping of sand by a groin can have *severe impacts* on the adjacent shoreline down the beach") (emphasis added); § 48–39–250(6) ("Erosion is a natural process which becomes a significant problem for man only when structures are erected in close proximity to the beach/dune system. *It is in both the public and private interests to afford the beach/dune system space to accrete and erode in its natural cycle.* This space can be provided only by discouraging new construction in close proximity to the beach/dune system and encouraging those who have erected structures too close to the system to retreat from it.") (emphasis added); § 48–39–260(3) (the policy of South Carolina is to "severely restrict the use of hard erosion control devices to armor the beach/dune system and *to encourage the replace-*

*ment of hard erosion control devices with soft technologies*[21] *as approved by [DHEC] which will provide for the protection of the shoreline without long-term adverse effects* ") (emphasis added); § 48-39-260(4) (the policy of our state is to *"encourage the use of erosion-inhibiting techniques which do not adversely impact the long-term well-being of the beach/dune system "*) (emphasis added); 23A S.C.Code Ann. Regs. at 30-11(D)(5) ("[DHEC] shall be guided by the prohibitions against construction contained in Section 48-39-290 and Section 48-39-300.... *These structures interfere with the natural system and impact the highest and best uses of the system. . . .*") (emphasis added).

## CONCLUSION

Because we hold as a matter of law that the Beachfront Management Act prohibits DHEC from issuing permits for the construction or reconstruction of new or existing groins, the grant of summary judgment to Respondents is reversed and the case remanded to the circuit court for entry of an order granting summary judgment to SCCCL and Sierra Club.

**REVERSED AND REMANDED.**

HEARN, C.J., and GOOLSBY, J., concur.

---

**21.** "Soft" solutions or technologies, as defined by DHEC, consist of beach nourishment and sand scraping.